**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **INTELL-A-CHECK CORPORATION,** | 01-CV-4625 (WJM) |
| **Plaintiff,** | |
| **v.** | *MARKMAN* OPINION |
| **AUTOSCRIBE CORPORATION and POLLIN PATENT LICENSING, LLC,** | HON. WILLIAM J. MARTINI |
| **Defendants.** | |

Frederick L. Whitmer
Brown, Raysman, Millstein, Felder & Steiner, LLP
163 Madison Avenue
Morristown, New York 07962-1989

    (*Attorney for Plaintiff*)

Kenneth C. Bass, III
Stern, Kessler, Goldstein & Fox
1100 New York Avenue, N.W.
Washington, D.C.  20005

David W. Denenberg
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Pennsylvania Plaza
37th Floor
New York, New York 10119-3701

    (*Attorneys for Defendants*)

**MARTINI, U.S.D.J.:**

This matter comes before the Court on the parties' submissions seeking the construction

of certain disputed claim terms.  For the reasons set forth in the Court's September 22, 2004

1

Opinion, and pursuant to the Order that accompanied that Opinion, only the following three

claim terms are at issue: 1) "automated;" 2) "apparatus" and "system;" and 3) "security

measures" and "coded embedding." On November 15, 2004, the Court conducted a *Markman*

hearing, during which it heard argument in support of the parties' proffered claim constructions.

Having reviewed the parties' submissions, and having heard argument, the Court construes the

disputed claim terms as follows.

## BACKGROUND

This is a patent infringement action involving four patents. The patents in suit are

related; they derive from the same initial application, Application No. 07/959,930, which was

filed on October 15, 1992. The patents in suit are: U.S. Patent No. 5,504,677 ("the '677 patent"),

U.S. Patent No. 5,727,249 ("the '249 patent"), U.S. Patent No. 5,966,698 ("the '698 patent"), and

U.S. Patent No. 6,041,315 ("the '315 patent"). They list Robert E. Pollin as the sole inventor.

The patents in suit are directed towards automated payment systems and methods. There

appear to be over 45 claims that are asserted to be infringed in this litigation. One of the more

relevant claims, which is representative of many of the asserted claims, is claim 2 of the '677

patent, which reads as follows:

> 2. An automated apparatus for generating a plurality of
> authorized drafts on financial accounts belonging to a plurality of
> payors, the drafts payable to one of a fixed set of one or more
> payees, comprising:
>
> input means for performing a manual input process wherein a
> system operator enters information specifying a new payor
> previously unknown to the apparatus and a draft to be generated on
> an account of that payor, said information including a financial
> institution identification number, payor account identifier, and an
> amount to be drafted from said payor's account;

processing means connected to said input means for receiving said input information and processing said information to format drafts on said financial account payable to said payee, said draft format including identification of said financial account, identification of said financial institution holding said financial account, and an instruction to pay said amount to said payee including a particular identification of said payee, and further including a signatory block for an authorizing signature other than said payor's signature;

output means for transferring said draft formats to an external magnetic printing means connectable to said processing means for generating a paper copy of said drafts using magnetically encoded ink and printing fonts compatible with clearing house check processing equipment;

wherein said apparatus is implemented on a computer using software which incorporates security measures for preventing fraudulent draft production, said security measures comprising the coded imbedding of said identification of said payee in said software whereby that payee information appearing on said drafts cannot be readily modified by a person gaining unauthorized access to said software.

'677 patent, claim 2.

The patented systems and methods are intended to improve upon previous systems and methods used to collect debts from customers, referred to as "payors" in the claim above. As described by the patents' specifications,[1] in the past, when a customer owed a debt to a merchant, referred to as the "payee" in the claim above, the merchant who sought to collect payment of the debt faced the prospect of the "promise to pay" or "the check is in the mail" response. The obvious problem with relying on the "promise to pay" method of debt collection is that there is no guarantee the merchant will actually receive payment because the customer could lie and not

---

[1]With the exception of some minor differences, which are insignificant for purposes of this background discussion, the patents in suit share an identical specification.

3

send a check or could issue a stop payment order preventing the merchant from cashing the check.

As a result, other debt collection mechanisms were developed. The merchant could use an electronic funds transfer, which takes funds directly from the customer's checking account and transfers them directly to the merchant. However, as the specifications state, this type of transaction was not entirely convenient because it could not be authorized over the telephone, but needed to be previously authorized by the customer in writing. *See* '677 patent, col. 2, line 55 - col. 3, line 7. Thus, a merchant could not use an electronic funds transfer to immediately debit the customer's checking account. Other debt collection methods suffered different flaws that likewise prevented the immediate debiting of the customer's account when the debtor authorized the collection method by telephone.

The inventor sought to circumvent these problems associated with debt collection by devising a system and method that permitted immediate debiting of the customer's bank account. *See* '677 patent, col. 3, lines 39-44. The claimed invention requires that the system operator obtain authorization over the telephone to debit the customer's account by acquiring the customer's bank account information. After the system operator inputs that information into a computer system, the system generates a paper draft payable to the merchant. The system then allows the merchant to submit that paper draft immediately which, in turn, results in the immediate debiting of the customer's account. By obtaining authorization over the telephone to debit the customer's bank account, the inventor eliminated the need to rely on a "promise to pay." And by printing the paper draft, the inventor eliminated the need to obtain prior authorization, as would be necessary in the case of an electronic funds transfer.

4

The inventor recognized that such an invention can be misused by system operators who are dishonest and choose to issue checks payable to unauthorized persons, *i.e.*, someone other than the merchant who is owed the debt. Accordingly, the claimed invention calls for the use of security measures to preclude operators from generating unauthorized drafts. These security measures may include password protecting the draft printing function, hard coding the payee's information into the payment collection program so that it cannot be changed by an operator, and encoding the payee information and dispersing it throughout the program. *See* '677 patent, col. 13, line 54 - col. 14, line 12.

## DISCUSSION

### I.    The Law of Claim Construction

At the *Markman* hearing, AutoScribe suggested that there are two different methods for construing claim terms, the dictionary rule, also referred to as the *Texas Digital* rule by AutoScribe, and the intrinsic evidence rule. (*Markman* Tr. ("Tr.") at 15:23-25). Basically, the difference between the two rules is how dictionaries are used as sources to help the Court construe disputed claim terms. Under the *Texas Digital* rule, dictionaries are used as one of the primary sources for claim interpretation. Under the intrinsic evidence rule, dictionaries are relegated to the second tier of sources, referred to as extrinsic evidence, and are only to be consulted if the intrinsic evidence, *i.e.*, the claims, specification and prosecution history, does not adequately define a claim term. Recognizing that this Court has in the past followed the *Texas Digital* line of cases, AutoScribe argued briefly that the more appropriate method of construing claim terms is the intrinsic evidence rule. (*Id.* at 17:19-18:8).

5

In support of its argument, AutoScribe discussed a recent Federal Circuit opinion in which Judge Michel stated that there is an issue as to whether the intrinsic evidence or the ordinary meaning of the term as set forth in a dictionary should be given priority as the primary reference for claim interpretation. *See Astrazeneca AB v. Mutual Pharmaceutical Co.*, 384 F.3d 1333, 1337-38 (Fed. Cir. 2004). Notably, Judge Michel passed on resolving this issue because it was not necessary to the holding of the case and because the Federal Circuit had already decided to address it in the *en banc* case *Phillips v. AWH Corp.*, 376 F.3d 1382, 1382-83 (Fed. Cir. 2004). Although *Astrazeneca* provides this Court with greater insight into the brewing debate before the Federal Circuit regarding the role of dictionaries in claim construction, it does nothing to diminish the impact of or overturn *Texas Digital*, which remains binding precedent dictating how this Court should construe disputed claim terms.

Further, even if this Court had the ability and desire to cherry-pick Federal Circuit claim construction opinions, at this time, the Court sees no compelling reason to alter its method of construing claims and ignore the ordinary meaning of a disputed claim term. By following the *Texas Digital* rule, as set forth below, a court still pays homage to the intrinsic evidence by reviewing the claims, specification and prosecution history to determine if the patentee in some way evinced a meaning different than the ordinary meaning. If the intrinsic evidence demonstrates that a disputed claim term bears a specific meaning, that meaning will be adopted regardless of the term's ordinary meaning. *See, e.g., Astrazeneca*, 384 F.3d at 1339 (finding that the inventors acted as their own lexicographers by limiting the scope of the term "solubilizer" to surfactants). Consequently, this Court will continue to follow *Texas Digital* and its progeny

6

unless and until the Federal Circuit decides that dictionaries should no longer be considered primary sources for interpreting claim terms.

Claim construction is a matter of law reserved for the Court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claim construction analysis begins with and remains focused on the language of the claims because it is that language the patentee purposefully chose to "particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201-02 (Fed. Cir. 2002) (quoting 35 U.S.C. § 112 ¶ 2). Because the words used in the claims are viewed from the perspective of one of ordinary skill in the art, the words bear a "heavy presumption" that they take on their ordinary meaning, unless the patentee evinced an intent to deviate from that meaning. *Id.* at 1202; *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003).

In order to determine the ordinary meaning of claim terms, the Court may look to the intrinsic evidence, i.e., the claims themselves, the specification and prosecution history, and dictionaries and treatises. *Texas Digital*, 308 F.3d at 1202; *Brookhill-Wilk*, 334 F.3d at 1298. When looking at the language of the claims, the Court must not only consider the claim terms in dispute, but their surrounding context as well. *Brookhill-Wilk*, 334 F.3d at 1299. Dictionaries and treatises, although helpful to determine the ordinary meaning of claim terms, must be used carefully. Since the ordinary meaning of words may change over time, the Court must limit its analysis to dictionaries and treatises that are informative of the ordinary meaning of the claim

terms as of the time the patent issued.[2] *Id.* (The references "are not contemporaneous with the patent, do not reflect the meanings that would have been attributed to the words in dispute by persons of ordinary skill in the art as of the grant of the '003 patent, and for those reasons are not considered in our . . . claim construction analysis."). Further, when attempting to ascertain the ordinary meaning of technical words, the Court must be circumspect about consulting general purpose dictionaries. *See, e.g., Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1369-70 (Fed. Cir. 2002). Finally, "[i]f more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." *Texas Digital*, 308 F.3d at 1203.

The specification and prosecution history must always be examined as part of the claim construction analysis to determine whether the presumption of ordinary meaning is rebutted. *Brookhill-Wilk*, 334 F.3d at 1298. First, the "presumption will be overcome where the patentee, acting as his or her own lexicographer, has clearly set forth a definition of the term different from its ordinary and customary meaning." *Id.* at 1299; *Texas Digital*, 308 F.3d at 1204 ("Indeed, the intrinsic record may show that the specification uses the words in a manner clearly inconsistent with the ordinary meaning reflected, for example, in a dictionary definition. In such a case, the inconsistent dictionary definition must be rejected."). Second, the presumption will be overcome where a patentee disclaims or disavows claim scope "by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Brookhill-Wilk*, 334

---

[2]Without further guidance from the Federal Circuit, the Court will not decide *ex ante* whether dictionaries at the time of issuance should be give greater weight than dictionaries in existence at the time the application was filed or an amendment was submitted. That decision should be made on a case-by-case basis depending primarily on which dictionary definitions are most consistent with how the term or terms are used in the patent.

F.3d at 1299; *Texas Digital*, 308 F.3d at 1204. "Last, as a matter of statutory authority, a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto, if the patentee phrased the claim in step- or means-plus-function format." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) (citing 35 U.S.C. § 112 ¶ 6).

If the ordinary meaning can be ascertained from the intrinsic evidence and contemporaneous dictionaries and treatises, the Court need not look to the extrinsic evidence as part of its obligation to construe the disputed claim terms. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

## II.    Disputed Claim Terms

### 1.      "automated"[3]

In order to construe the term "automated," the Court must first resolve a threshold issue – is "automated" a limitation in need of construction even though the word appears in the preamble of the identified claims?  Only if the answer to that question is yes, is it necessary for the Court to construe this term.

Generally speaking, there are three parts to every claim: the preamble, the transitional phrase, and the body.  The transitional phrase, *e.g.*, "comprising" or "consisting of," connects the preamble to the body of the claim.  The preamble is the portion of the claim that includes

---

[3]The following patents and corresponding claims were identified by the parties in the Joint Claim Construction Chart ("Joint Chart") as relevant to construction of this term: '677 patent (claims 2, 22, 37, 39, 40, 46), '249 patent (claims 1, 2, 6-8, 12, 20, 21, 25, 28, 42-44, 48, 52-54), '698 patent (claims 1-3, 6, 7), and '315 patent (claims 1, 2, 4-8, 10, 12-19, 21-23).

everything before the transitional phrase.  The body is everything after the transitional phrase.

For example, the preamble of claim 2 of the '677 patent reads:

> An automated apparatus for generating a plurality of authorized
> drafts on financial accounts belonging to a plurality of payors, the
> drafts payable to one of a fixed set of one or more payees . . . .
> '677 patent, claim 2.

With regard to the claims identified as containing the term "automated," almost all of them only use the term in the preamble.

Terms found solely in the preamble are not to be construed if the body of the claim sets forth the complete invention. *Altiris, Inc. v. Symantic Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003).  Thus, if the preamble does not give "life, meaning and vitality to the claim," the preamble is considered to be "of no significance to claim construction because it cannot be said to constitute or explain a claim limitation." *Id.*  In order to determine whether the preamble should constitute a limitation, the Court must look to the "overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history." *Id.*  When the preamble merely states a "purpose or intended use for the invention," it is not limiting. *Catalina Mktg. Int'l v. Coolsavings*, 289 F.3d 801, 808 (Fed. Cir. 2002).

AutoScribe contends that "automated" is merely an "intended use" of the invention. However, beyond that bald statement, AutoScribe fails to explain why that is the case.  That may be because the intended use of the invention is not "automated," but to pay the amount owed to the payee in a more timely, less cumbersome fashion then waiting for a check to be delivered in the mail.  The intrinsic evidence reveals that the word "automated" is more than a purpose or intended use for the invention, but describes how the claimed system functions and achieves its

purpose. All of the patents are directed towards an "Automated Payment System." *See, e.g.,*

'677 patent, Title of Invention, col. 1, line 1. As the '677 specification elaborates, an "object of

the present invention is to provide a process for receiving payments in which an *automated* draft

production system is provided to produce authorized drafts on the account of a payor, executable

by a person other than the payor." '677 patent, col. 4, lines 40-44 (emphasis added).[4] The

claimed invention is also described as follows:

> The *automated* system used to generate the drafts in the preferred
> embodiment has a simple input screen which receives the
> necessary information for generation of the draft . . . . The system
> then immediately verifies the bank and account information by
> comparing the input information to the data in a bank information
> database associated with the system. '677 patent, col. 5, lines 6-14
> (emphasis added).

Thus, there is nothing that conveys "automated" amounts to a mere purpose or intended use; on

the contrary, it is a limitation that requires construction. Buttressing this conclusion, is the fact

that the term "automated" is not always relegated to being used in the preamble. For example, in

the '315 patent, the term "automated" is used in the body of several claims. *See* '315 patent,

claim 8 ("providing an automated draft production computing system"), claim 10 ("providing an

automated payment order computing system"), and claim 12 ("according to automated check

clearing house conventions"). Accordingly, the Court shall construe the term "automated."

With respect to how it should be construed, originally, Intell-A-Check argued that it

required all of the elements of the body of the claim be performed in a self-acting manner

"without any human intervention." (Pl.'s May 22, 2003 Br. at 15). However, that definition

---

[4]Although the Court only cites to the '677 patent in this instance for support, as explained
above, all of the patents in suit contain a similar, if not identical disclosure because they are
related patents, derived from the same initial patent application.

ignored an element of the disputed claims that requires some input from the system operator. *See, e.g.*, '677 patent, claim 2, col. 17, lines 41-47.  Subsequently, without explanation, Intell-A-Check changed its position.  In the Joint Chart, Intell-A-Check proffered a definition for "automated" that included in relevant part "working with little or no human actuation" based on the dictionary definition for "automatic."  *See The New Short Oxford Dict.* 152 (1993).[5]  This general dictionary definition appears to be more appropriate and consistent with how the term is used in the identified claims, which require that most elements be performed by the computer system with little human involvement.

Inexplicably, Intell-A-Check then proffered a third construction at the *Markman* hearing. Recognizing that its first construction, which allowed for no human input, was fatally flawed, and apparently not satisfied with the second construction, Intell-A-Check asked this Court to limit the term such that after the operator has entered the specific payor information, the claimed invention allows for *no* human involvement.  (Tr. at 22:3-8).  This construction, however, finds no support in the patents' disclosures.  For example, claim 8 of the '315 patent explicitly calls for human interaction after the system operator inputs all of the relevant payor information into the system because it requires that the printed draft be submitted to the automated check clearing system for processing.  Further, and perhaps more importantly, even a layperson reviewing the patents in suit would understand that an automated computer system may need some limited amount of human involvement after inputting the relevant draft information in order to ensure the

---

[5]The second definition given for "automatic," which is the one cited to for support by Intell-A-Check, states in full: "Self-acting; *esp.* (of a machine, device, etc.) working of itself, with little or no direct human actuation; (of a process etc.) working thus, involving such equipment." *The New Short Oxford Dict.* 152 (1993).

system works correctly.  For example, the computer may freeze, requiring the user to reboot the system and reenter the payor information.  Or, a printer cartridge may run out of ink and need to be replaced.  Because Intell-A-Check's third proposed construction ignores claim language, and ignores the known reality of how a user operates a computer system, it cannot possibly be correct and, thus, must be rejected.

Finally, AutoScribe, relying on its argument that this Court should not look to a dictionary definition to determine the ordinary meaning of the term, argues that "automated" should be construed to mean "the use of a system or apparatus to undertake tasks traditionally performed by human beings." (Tr. at 17:19-18:13).  As stated above, this Court will adhere to *Texas Digital* and its progeny unless and until the Federal Circuit reverses its position on the use of dictionaries in *Phillips*.  But, assuming *arguendo* AutoScribe is correct, the Court still disagrees with AutoScribe's proposed construction.  Using AutoScribe's construction, an "automated apparatus" means "an apparatus used to undertake tasks traditionally performed by human beings."  In other words, it does not allow for any human interaction.  Obviously, this construction suffers from the same flaw as Intell-A-Check's first proffered construction and, for the same reason, must be rejected.

In summary, the Court adopts the ordinary meaning of the term "automated," which is most consistent with how the term is used in the patents.  Accordingly, "automated" means "working with little or no human actuation."

2.      "apparatus" and "system"[6]

As with the term "automated," AutoScribe argues that because "apparatus" and "system" are included in the identified claims' preambles, they should not be construed.[7] This argument, however, flies in the face of the patents' disclosures and therefore is wrong. Unlike "automated," which was referred to most often in the preamble of the relevant claims, the terms "apparatus" and "system" are consistently used in the body of the claims. Indeed, they are used in the body of 42 out of the 45 identified claims. Even in those claims where the terms are used solely in the preamble, they breathe life and meaning into the claims, not by describing a purpose or intended use, but by adding structure to them. Thus, the argument that the terms are located in the preamble and therefore should not be construed, simply ignores how the patentee chose to claim his invention and thus is inapt. Accordingly, both terms will be construed.

After reviewing the intrinsic record, it is clear that "apparatus" and "system" should be construed to mean the same thing. They are used interchangeably in the patents in suit. *See, e.g.,* '677 patent, claim 2 (claiming an "automated apparatus" that is used by a "system operator"); claim 37 (claiming an "automated apparatus" and then referring to that apparatus as a "system" in the body of the claim). Moreover, the parties proffer the same definition for both terms. Thus, they will be given the same construction.

---

[6]The pertinent claims identified by the parties are: '677 patent (claims 2, 22, 37, 39, 40, 46), '249 patent (claims 1, 2, 6-8, 20, 21, 25, 28, 42-44, 48, 52-54), '698 patent (claims 1-3, 6, 7), and '315 patent (claims 1, 2, 4-7, 12-19, 21-23).

[7]It is worth noting that this argument was first articulated in the Joint Chart. In its claim construction brief, AutoScribe contended that they were limitations that should be construed. (Def.'s May 22, 2003 Br. at 24).

Both parties cite to the specifications of the patents to support their slightly different constructions. AutoScribe, generalizing based on its references to the '677 specification, argues that the terms mean "computer hardware installed with computer software." (Joint Chart at 2). Intell-A-Check, quoting a particular portion of the specification, argues that they mean "a computer, with a display screen, keyboard and printer, on which the required software program is running." (*Id.* at 1-2 (quoting '677 patent, col. 6, lines 40-44)). Although they agree that both terms involve a computer running on the appropriate software,[8] AutoScribe's definition is very general, effectively not limiting the definition to any type of computer hardware used by the operator, whereas Intell-A-Check's definition is more narrow, and limits the system to a computer, keyboard, display and printer. Thus, the issue boils down to what type of computer system, if any, is required by the relevant claims.

In this case, Intell-A-Check has the better argument. There is no dispute that the computer requires at least an input device and a display device. Thus, the issue devolves into whether a printer is included in "system" and "apparatus." All of the claims, but one, explicitly require the production of a paper draft. Claim 10 of the '315 patent does not. AutoScribe argues that is because claim 10 does not produce a paper draft, but is directed to a paperless transaction.[9]

_____

[8]The intrinsic records supports the parties' agreement. *See, e.g.*, '677 patent, claims 2, 22 ("wherein said *apparatus* is implemented on a *computer using software*"); '249 patent, claims 1 and 7 ("automated *computer-based apparatus* . . . wherein said *apparatus* is implemented using *software*"); '315 patent, claim 12 ("a standalone personal *computer apparatus*").

[9]Claim 10 of the '315 patent reads:

> An automated process for making payments from a payer having a
> financial account at a financial institution to a payee based on
> authorization in a telephone conversation between the payer and a

(continued...)

15

However, that construction is not supported by the '315 patent's disclosure.  Indeed, the '315 specification directly contradicts such a construction.

---

[9](...continued)
 system operator representing the payee, comprising the steps of:

 providing an automated payment order computing system having an input screen for receiving payment order input information;

 conducting a telephone conversation with a payee who has not previously authorized payments to payee by telephone, in which said system operator obtains said payment order input information, including at least identification of said financial account and a financial institution identification code identifying said financial institution holding said financial account, and contemporaneously enters said payment order input information in said input screen;

 using said computing system, automatically verifying said financial institution identification code contemporaneously with system operator entry of said draft input information, by comparing said code to entries in an institutional database and determining whether said code matches an entry in the database;

 if said code matches an entry in the database, retrieving identifying information about the institution and displaying said identifying information for the system operator whereby the system operator may verify institution identification with the payer;

 if said code does not match an entry in the database, displaying an error indication to the system operator whereby the operator may request corrected information from the payer;

using said input information, generating an *electronic record* containing information sufficient to generate an *order to pay* an amount authorized by said payer to said payee; and

processing said *electronic record* and transmitting information to a central clearing system for processing to cause a *transfer of funds* from said payer account to said payee.

(Emphasis added).

The Abstract of the '315 patent summarizes the claimed invention as follows:

> A system and method of collecting payments uses an automated *system to generate a draft*, payable to the creditor and drawn on the payor's checking account, pursuant to the payor's authorization. The draft is then executed by the debt collector as authorized signatory for the payor, and deposited into the payee's account to complete payment. The automated *system* has a simple input screen which receives the necessary information *for generation of the draft* . . . . When verification is complete, the *system generates a paper bank draft* payable to the payor . . . . '315 patent, Abstract (emphasis added).

Similarly, the "Field of Invention" depicts the invention as a system that generates a printed draft. '315 patent, col. 1, lines 17-19 ("The present invention relates to systems and methods for collecting payments using an automated *draft printing system* operated by a payment collector.") (emphasis added). Further, and probably of greatest significance to determining whether the patentee limited the construction of the term "apparatus" and "system," is the statement in the '315 specification that differentiates the patented system from one that allows electronic funds transfers. The '315 specification states in pertinent part:

> One solution to the problems of reliably collecting repeated payments is a pre-authorized electronic debit. Many large and well-connected creditors, such as banks and the finance arms of automobile manufacturers, generate monthly tapes of authorized payments which are then processed electronically within the banking system. Funds are withdrawn from the checking account of the consumer and transferred directly to the creditor. . . . [S]uch *electronic funds transfers cannot be authorized by telephone*; a written authorization is legally required, *so that immediate authorized collection of a debt cannot be accomplished by this method.* '315 patent, col. 2, line 53 - col. 3, line 5 (emphasis added).

As clearly described by the patentee, the patented invention allows for the immediate collection of debts. *See, e.g.*, '315 patent, col. 3, lines 37-41 ("Therefore, the inventor believes

there is a need for an improved system and method for collection of debts which can be used for immediately debiting a debtor's bank account when the debtor authorizes this collection method by telephone."). Because electronic funds transfers could not be authorized by telephone, in contradistinction to the patented invention, a person of ordinary skill in the art reading that specification would understand that electronic funds transfers were not included within the scope of the patent. In fact, the patentee represented as much when prosecuting the application that matured into the '677 patent by stating, "the electronic debits of the banking system do not suggest the present invention or provide its advantages." Application No. 07/959,930, May 14, 1993 Petition to Make Special for New Application at 10.

"Where the general summary or description of the invention describes a feature of the invention (here, [immediate debt collection authorized by telephone]) and criticizes other products (here, [electronic funds transfers]) that lack that same feature, this operates as a clear disavowal of these other products (and processes using these products)." *Astrazeneca*, 384 F.3d at 1340. Thus, the patentee disavowed electronic funds transfers authorized by telephone in the specification. Since the method in claim 10 requires obtaining authorization during a telephone conversation, it cannot encapsulate electronic funds transfers; rather, it must be construed to include the production of a paper draft which provides the necessary written authorization to immediately collect the debt owed. In other words, the disputed terms shall be construed to include a printer.

In sum, the terms "apparatus" and "system" mean "computer hardware running with the required software program, including at least a computer, display screen, input device (*e.g.*, keyboard, mouse), and associated printer."

3.      **"security measures" and "coded embedding"**[10]

Although the parties acknowledged for the first time at the *Markman* hearing that

"security measures" and "coded embedding" are not identical, they did not offer the Court any

proposed construction for the term "security measures." Consequently, it falls to the Court to

determine the meaning of "security measures."

The claimed invention seeks to prevent dishonest persons from misusing the invention by

issuing drafts payable to someone other than an authorized payee. The system uses "security

measures" to "reduce the likelihood of production of unauthorized drafts." '677 patent, col. 4,

lines 31-34. Every time the term "security measures" is referred to in the identified claims, it

includes, but is not limited to, "coded embedding." *See, e.g.*, '677 patent, claim 2 ("security

measures comprising the coded imbedding of said identification of said payee in said software");

claim 22 (same); claim 37 (same); claim 39 (same). Other security measures that are available in

addition to "coded embedding," include password protection and encryption. *See, e.g.*, '249

patent, claim 12 (claiming hard coding and password protection as security measures). Thus,

"security measures" is broader than "coded embedding" and shall be construed as "measures

taken to preclude the generation of drafts payable to someone other than the payee, including at

least coded embedding of the payee identification information."

With respect to "coded embedding," both parties agree that it is synonymous with "hard

coding." Given that, and the fact that the patent examiner explicitly found that the terms are

---

[10]The identified relevant claims are claims 2, 22, 37, 39, 40, 46 of the '677 patent and
claims 1, 2, 6-8, 12, 20, 21, 25, 28, 42-44, 48, 52-54 of the '249 patent.

19

synonymous,[11] this Court agrees.  However, in defining "coded embedding/hard coding," both parties err.

AutoScribe suggests that "coded embedding" means "[a]n adjective describing a routine or program that is designed for a specific situation or that uses *imbedded constants* in place of more general user input." (Joint Chart at 2, emphasis added).  The problem with that definition is that it is circular, using "imbedded constants" to define "coded embedding."  Intell-A-Check on the other hand originally argued that "coded embedding" means "*fixing* within a given copy of the program the payee identification information and the *secreting* thereof into the program code so that it cannot be changed." (*Id.*, emphasis added).  In making that argument, Intell-A-Check goes too far by adding the requirement that coding requires secrecy.  Coding does not require secrecy, and Intell-A-Check admitted as much at the *Markman* hearing.  (Tr. at 68:7-19).

However, the Court, and AutoScribe based on its representation at the *Markman* hearing,[12] agree with the first portion of Intell-A-Check's construction – "fixing within a given copy of the program the payee identification information."  The '677 and '249 specifications support that construction by disclosing that "the payee is hard-coded into the program and cannot be readily changed even by an authorized user of the system." '677 patent, col. 13, lines 66-67; '249 patent, col. 13, lines 54-55.  Although Intell-A-Check appears to suggest that the payee identification information should be fixed within a specific file on the system, *e.g.*, an identifiable executable file, this Court finds no such limitation in the patents' disclosures and,

---

[11]'249 prosecution history, Application No. 08/625,295, March 13, 1997 Office Action at 5.

[12](Tr. at 76:4-9).

therefore, will impose no such limitation.  As long as the payee identification information is fixed within the program, regardless of what file it is located in that is associated with the program, the information is properly "coded embedded / hard coded."

In conclusion, the Court will construe "coded embedding" and "hard coding" to mean "fixing within a given copy of the program the payee identification information."

## CONCLUSION

For the aforementioned reasons, the Court construes the disputed claim terms as follows:

1.      "automated" means "working with little or no human actuation."

2.      "system" and "apparatus" mean "computer hardware running with the required software program, including at least a computer, display screen, input device (*e.g.*, keyboard, mouse), and associated printer."

3.      "security measures" means "measures taken to preclude the generation of drafts payable to someone other than the payee, including at least coded embedding of the payee identification information."

4.      "coded embedding" and "hard coding" mean "fixing within a given copy of the program the payee identification information."

William J. Martini, U.S.D.J.

cc:     The Hon. Ronald J. Hedges, U.S.M.J.